**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CURTIS RODERICK HOFFMAN,

      Petitioner,               Civil No. 2:07-CV-14147
                                 HONORABLE ARTHUR J. TARNOW
v.                             SENIOR UNITED STATES DISTRICT JUDGE

CAROL R. HOWES,

      Respondent,
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, ISSUING A CERTIFICATE OF APPEALABILITY AS TO CLAIMS III AND IV, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Curtis Roderick Hoffman, ("petitioner"), confined at the Lakeland Correctional

Facility in Coldwater, Michigan, has filed a petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.[1] In his *pro se* application, Petitioner challenges his conviction for

first-degree murder. M.C.L 750.316, on the following grounds:

> I. The Michigan Court of Appeals - not the trial court - erroneously relied on
> M.C.R. 6.508(D)(3) to deny Petitioner's application for leave to appeal even
> though all the Petitioner's claims are "jurisdictional" defects.
>
> II. The preliminary examination started 101 days after the Petitioner was
> arrested, thus, the Petitioner was improperly bound over to the circuit court.
>
> III. Petitioner's trial and appellate counsels were ineffective within the
> meaning of the Sixth Amendment.

---

[1] When petitioner originally filed his petition for writ of habeas corpus, he was incarcerated at the Mound Correctional Facility, but has since been transferred to the Lakeland Correctional Facility. The only proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner would be the warden of the facility where the petitioner is incarcerated. *See Edwards v. Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also* Rule 2(a), 28 foll. U.S.C. § 2254. Therefore, the Court substitutes Warden Carol R. Howes in the caption.

IV. Petitioner was denied his constitutional right to a retained attorney of his choice.

V. This Court should issue the writ because of the state's prosecutorial misconduct in his closing arguments.

For the reasons stated below, the petition for writ of habeas corpus is denied.

## I.  Background

Following a jury trial in the Calhoun Circuit Court, Petitioner was found guilty of first-degree murder and was subsequently sentenced to life imprisonment. The charges arose from a cold-case investigation relating to death of Vincent Brown. On August 25, 1986, Brown's body was discovered in a ditch on the eastbound side of I-94. Brown had been shot in the head and a bullet casing was found near his body. The case remained unsolved for over sixteen years when Petitioner was charged and subsequently found guilty of committing the murder.

Following his conviction Petitioner pursued an appeal of right in the Michigan Court of Appeals, claiming that he was denied the right to counsel of his choice and that prosecutorial misconduct rendered his trial unfair. These two issues now form his fourth and fifth habeas claims. The state appellate court affirmed in an unpublished opinion. *People v. Hoffman*, No. 252513 (Mich. Ct. App. May 10, 2005). Petitioner filed an application for leave to appeal in the Michigan Supreme Court raising the same two issues, but it was denied by standard order. *People v. Hoffman*, No. 128914 (Mich. Sup. Ct. October 31, 2005).

Petitioner then filed a motion for relief from judgment in the trial court, raising four claims. Two of these claims now form his second and third habeas claims: that the trial

court did not have jurisdiction because the preliminary examination was untimely, and that Petitioner was denied the effective assistance of trial and appellate counsel. He also filed a motion seeking an evidentiary hearing to support his ineffective assistance of counsel claim. The trial court denied both motions by order dated August 7, 2006.

Petitioner filed an application for leave to appeal this decision in the Michigan Court of Appeals. The application raised the same four claims presented to the trial court. Petitioner also filed a motion to remand the case to the trial court for an evidentiary hearing. The Court of Appeals issued an order denying the motion to remand and denying the application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Hoffman*, No. 273827 (Mich. Ct. App. May 3, 2007).

Petitioner appealed this order to the Michigan Supreme Court. His application for leave to appeal raised the same substantive issues and also raised what now forms his first habeas claim, asserting that the Michigan Court of Appeals had improperly applied M.C.R. 6.508(D) to his jurisdictional claim. Nevertheless, the Michigan Supreme Court denied leave to appeal with citation to M.C.R. 6.508(D). *People v. Hoffman*, No. 133982 (Mich. Sup. Ct. September 10, 2007).

Petitioner thereafter filed the instant petition.

## II. Facts

At trial, the prosecutor's theory of the case was that Petitioner was an enforcer in the so-called Vasquez organization which was involved in the distribution of large amounts of

marijuana in Michigan in the 80's. According to the prosecution, the murder victim, Vincent Brown, was killed for his failure to pay Tommy Vasquez for drugs that were "fronted" to him by Petitioner.

Kevin Roberts testified that he worked as an equipment operator for MDOT. On August 25, 1986,he was on eastbound I-94, four miles east of Marshall. While driving a backhoe, he discovered the body of a black male, five to eight feet from the shoulder of the highway. Roberts got off his tractor, went to the body, and saw what appeared to be a hole to the side of the man's head with blood circling it. Roberts called the police.

Calhoun County Deputy Thomas Case responded to the call. Case discovered a baseball cap and a spent shell casing near the road. The body appeared to have been dragged to its location. The body was not easily visible, lying in a ditch area.

Dr. Ila Peterson, an expert in the area of forensic pathology, performed the autopsy of Brown in 1986 to determine manner and cause of death. Brown had a gunshot wound to the right side of the back of his head. He also had abrasions on the left side of his body, deeper ones on his left forearm, possibly from being dragged, and what appeared to be needle marks. After further investigation detectives identified the body as belonging to Brown.

Catherine Delores Young testified that she lived with Brown for over nine years but was not residing with him in 1986. Young spent August 24th with Brown and stayed until about 2:00 p.m.. At that time, Brown told Young that he needed to get ready for community college, which he was starting the next day. Young was aware that Brown sold small amounts of marijuana from their home, and she knew that Brown owned one handgun.

Bart Stafford testified he and Brown were good friends. Stafford purchased marijuana from Brown once or twice a week. Stafford saw other people buy marijuana from Brown as well. Stafford went to Brown's apartment on August 24th, late in the evening to celebrate Brown's return to college. To celebrate, they smoked marijuana and bought champagne and beer. Brown seemed down, like something was bothering him. Brown asked to borrow $300.00 from Stafford, which he had never done before. Stafford gave the money to Brown and then left since he had to work the next morning. Brown's body was found the next morning.

The initial police investigation did not result in any arrests, and the case remained unsolved until it was re-opened in 2002 by a cold case homicide team.

At the time of trial, Vincent Bridges testified that he was serving time in prison for failure to pay child support. Bridges did not receive a deal for his testimony. Bridges was acquainted with Brown through drug dealing in 1986. Bridges also knew Tommy Vasquez, John Vasquez, and Petitioner.

Bridges explained the hierarchy of the Vasquez drug-dealing organization: Charles Rushing was at the top of the hierarchy, bringing marijuana from Mexico and Texas to Michigan; Tommy Vasquez followed Rushing, John Vasquez followed Tommy, and Petitioner was higher in the organization than Bridges. Bridges said that Petitioner and Tommy Vasquez had been friends a long time. Bridges explained that the Rushing-Vasquez connection moved approximately 500 pounds of marijuana a month through the Michigan area until the organization was taken down. Through this association, Bridges met Tommy Vasquez. Bridges met Petitioner sometime around 1985 at a towing business owned by Tommy Vasquez.

Bridges was familiar enough with the Vasquez organization to know Petitioner's position in it was a "distributor and money picker-upper." Petitioner carried a gun. Bridges paid John Vasquez through Petitioner for marijuana that was fronted to Bridges. Bridges also knew Petitioner transported marijuana from Texas to Tommy Vasquez's farm in Michigan.

Lori Fields testified that she knew Petitioner and Vincent Brown. Moore overheard a conversation between Petitioner and Tommy Vasquez after Brown's death. Moore heard Petitioner say it was too bad that he was dead.

Kim Polenda was involved with Petitioner. Some time in 1986, Petitioner and Polenda moved from Marshall to Grand Rapids for seven to eight months. While in Grand Rapids, nearly every weekend they made trips back to Calhoun County, Battle Creek and Marshall.

Polenda knew Petitioner and Tommy Vasquez were best friends. After 1986, the year of Brown's murder, Petitioner spent more time with Tommy Vasquez. Once, while she was fighting with Petitioner, he called her a "n****r loving bitch" and that he would "kill her like he did the n****er." Polenda did not previously give this information to investigators because she was scared.

Sandra Scheffler had known Petitioner and Tommy Vasquez from the time she was twelve years. As an adult, Scheffler sold marijuana for Tommy Vasquez. On one occasion, Scheffler drove to Texas with Tommy Vasquez, one of his girlfriends, Petitioner, and another individual. She went to Texas other times as well. They met Charles Rushing in Texas.

By the time Charles Rushing appeared to testify in Petitioner's trial, he had been incarcerated for approximately 13 years of a 33-year sentence for conspiring to possess and deliver marijuana with Tommy Vasquez. He was 69 years old. Rushing claimed he was serving such a long sentence because he declined a deal offered by the federal authorities that would have limited his sentence to five years. Rushing declined the offer because he refused to testify against Tommy Vasquez and his people. Rushing said that decision was stupid because he now knew that those individuals would have testified against him.

Rushing refused to talk to the cold case team initially, but his thinking had changed over the years as he sat at Leavenworth: he had two teenage daughters and the fact that his own nephew had been murdered prompted him to testify. Rushing testified that he was not promised anything by state or federal prosecutors in exchange for his testimony, and he had no illusions about the length of his sentence.

Rushing testified that he met Tommy Vasquez in 1985, and they began doing business in early 1986. Rushing located and bought marijuana for Tommy Vasquez. They began with about 150 pounds, suffered a setback after a sting, then the amounts escalated again in 1987-1988 with 500-pound and 1,000-pound loads.

Rushing saw Petitioner bringing money in that was owed to Tommy Vasquez. Petitioner carried a gun in his boot. While waiting to collect money to take back to Texas, Rushing overheard a conversation between Tommy Vasquez and Petitioner at the farm about "Spankie" (Vincent Brown 's nickname) owing money, and that they could not find him. They were counting money at a table. Rushing testified that Petitioner did not bring in all the money since Spankie did not pay up, and he asked Tommy Vasquez what he

should do. Petitioner asked, "do you want me to whack him?" Tommy Vasquez replied that Petitioner should kill him. Vasquez also told Petitioner that "you got to spank that n****er."

Rushing also knew Robert Candelaria from the Vasquez farm and recalled a conversation where Candelaria was short on money. In the latter part of 1987, a conversation took place in a topless bar in San Antonio, Texas. Tommy Vasquez, Petitioner, Rushing, and two or three other people were present. Tommy Vasquez said they had another "Spankie" on their hands. Petitioner asked Vasquez what he wanted him to do, and whether he should spank him. When he said this, Petitioner made a gesture with his hand and said, "bang." Vasquez said that was possible.

Later, possibly in 1988, Rushing recalled another conversation at a bar in Houston. Rushing recalled the time because of the fact that he had a girl with him, Sandy Perkins. Petitioner was present and talking with Vasquez. Vasquez asked if they had another "Spankie", referring to Candelaria, and asked if he wanted him to whack him.

Robert Candelaria testified that he was indicted by the federal government in 1991 for conspiring to deliver between one and three tons of marijuana. Candelaria pled to receive a ten-year sentence and had been released about one year prior to Petitioner's trial. He explained that he had nothing to gain by testifying in Petitioner's trial.

He testified that he chose to testify as a way of making amends for his past. Candelaria was a type of "wholesaler" for the organization. He would buy large amounts of marijuana from various connections he had in Texas, using Tommy Vasquez as a last resort. He bought between 300 and 600 pounds of marijuana at a time from the Vasquez organization a few times a month on average. Candelaria went to the Vasquez farm 50 or

60 times to pay "large sums of money" for drugs he bought and/or to pick up more. Candelaria described Petitioner as Tommy Vasquez's right-hand man and enforcer.

After he was indicted, Candelaria took his son to the fair, knowing he was facing incarceration. While at the fair, Petitioner and some others from the organization approached him. This made Candelaria very nervous because he was not to have contact with any of them while under indictment, and he was with his young son. Petitioner appeared intoxicated and started talking to Candelaria about the drug conspiracy case they were indicted for, both men said they would not testify against the other, and then Petitioner told him they were questioning him about "some n****r that they had found by the 115 off of 94," but that they did not have enough proof because he had done a clean job. Candelaria was very upset that this occurred in front of his son, and cut the conversation short.

Raymond Espinoza was in his fourteenth year of incarceration on a 25-year sentence for armed robbery when he testified in Petitioner's murder trial. If Espinoza testified truthfully, a federal attorney would write a rule 35 letter to the federal sentencing judge who would then decide if Espinoza should receive consideration on his sentence.

While incarcerated in 1996, Espinoza met Petitioner. They worked with Unicore, making army uniforms and were seated together. An African-American man bumped in to their cart, making Petitioner really angry. Petitioner asked Espinoza if he liked African-Americans. Espinoza said he did not, and Petitioner said he did not either and that he had killed one. Espinoza asked Petitioner what made him kill the man he was talking about. Petitioner continued, saying he had "killed this n****r by the name of Spankie Brown. Petitioner told Espinoza that Brown owed him money for Vasquez's drugs.

Petitioner told Espinoza he killed Spankie Brown on August 2, 1986, in the late evening. Petitioner told Espinoza he drove Spankie around for a few hours, trying to get some of the money he owed back. Spankie was not able to collect any of the $50,000, so they drove to the side of the freeway, Vasquez ordered Spankie out of the car, and he ordered Petitioner to shoot him. Espinoza testified that Petitioner indicated he shot Spankie from about arm's length away, in the back of the head. After he shot him, Petitioner pushed him to the side of the road, and left. After receiving all of this information from Petitioner, Espinoza wrote letters to the court and eventually had contact with the FBI and Calhoun County cold case team.

Petitioner testified in his own defense. He denied committing the offense. He testified that in 1986 he was living in Grand Rapids. He admitted that he had pled guilty in a federal case involving the Vasquez organization. But Petitioner denied he knew the victim. He admitted that he was in prison with Espinoza and talked with him, but he never told him about the killing. He could not recall having a conversation with Candelaria at a fair.

Following closing arguments and jury instructions, Petitioner was convicted of first-degree murder.

## II. Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.


### III.  Discussion

**Claim 1. The Michigan Court of Appeals - not the trial court - erroneously relied on M.C.R. 6.508(D)(3) to deny Petitioner's application for leave to appeal even though all the Petitioner's claims are "jurisdictional" defects.**

Petitioner's first claim argues that the Michigan Court of Appeals erred in denying his application for leave to appeal under M.C.R. 6.508(D) during his post-conviction proceeding because the motion raised jurisdictional claims. Petitioner notes that M.C.R. 6.508(D)(3) specifically excludes jurisdictional claims from the procedural rule that generally requires an appellant to raise his claims during his direct appeal. Petitioner's second claim asserts the jurisdictional claim referred to; because the preliminary

examination was held 101 days after Petitioner's arrest, the trial court lost jurisdiction to try him. Respondent contends that the claims are not cognizable.

With respect to Petitioner's first claim, because there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition. *Williams-Bey v. Trickey*, 894 F. 2d 314, 317 (8th Cir. 1990); *See also Kirby v. Dutton*, 794 F. 2d 245, 247-248 (6th Cir. 1986)(defendant's claims that he was denied the effective assistance of counsel, due process, and equal protection in state's post-conviction proceedings were unrelated to his detention and could not be brought in a federal habeas corpus petition). Even if the state court improperly refused to review the merits of Petitioner's jurisdictional claim, Petitioner's federal constitutional rights were not implicated because he had no constitutional right to post-conviction review.

**Claim 2. The preliminary examination started 101 days after the Petitioner was arrested, thus, the Petitioner was improperly bound over to the circuit court.**

Petitioner's second claim similarly does not state a claim cognizable by this Court. The determination of whether a state court is vested with jurisdiction under state law is a "function of the state courts, not the federal judiciary." *Wills v. Egeler*, 532 F.2d 1058, 1059 (6th Cir. 1976); *Wright v. Angelone*, 151 F.3d 151, 157-58 (4th Cir. 1998); *Rhode v. Olk-Long*, 84 F.3d 284, 287 (8th Cir. 1996). It is well-settled that a perceived violation of state law may not provide a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The Court may grant a writ of habeas corpus only on the ground that the

petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A state court's interpretation of state jurisdictional issues conclusively establishes jurisdiction for purposes of federal habeas review. *See Strunk v. Martin*, 27 Fed. Appx. 473, 475 (6th Cir. 2001). Any state-law procedural defect in the state district court proceedings that affected the jurisdiction of the state circuit to try him does not implicate Petitioner's federal constitutional rights.

### Claim 3. Petitioner's trial and appellate counsels were ineffective within the meaning of the Sixth Amendment.

Petitioner claims that he was deprived of the effective assistance of trial and appellate counsel. Specifically, Petitioner claims that his trial attorney failed to investigate a number of potential defense witnesses, and his appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim during his direct appeal and for failing to seek an evidentiary hearing. He supports the claim with excerpts of police reports containing statements made by Elwood Priess, Erwin Smith, Patti Ware, and a report and interview transcripts concerning Milo Burton. Respondent argues that the claim is procedurally defaulted under M.C.R. 6.508(D)(3).

This claim was first raised in Petitioner's motion for relief from judgment. The trial court denied the motion on the merits, and denied a motion for an evidentiary hearing, stating:

> [T]he representation of both trial and appellate counsel was not ineffective. All counsel pursued aggressively the relevant claims that could have been made. The failure to appeal any bindover issues did not prejudice the defendant; the potential witnesses mentioned would not have added anything to the defense of the case; and the appellate attorney argued all of the proper issues in the appeal.

The motion for *Ginther* hearing is denied for the reason that the record established that both trial counsel and appellate counsel represented defendant with skill and diligence; all reasonable theories and claims were effectively presented and argued; and the evidence was overwhelming in establishing the defendant's guilt.

The Michigan Court of Appeals and the Michigan Supreme Court both subsequently rejected petitioner's post-conviction appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

The Sixth Circuit has conflicting decisions regarding the sufficiency of this language to invoke the procedural bar in Rule 6.508(D)(3) and constitute a procedural default in federal court. Compare *Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000) (language alone sufficient to constitute invocation of procedural bar), with *Abela v. Martin*, 380 F.3d 915, 923-24 (6th Cir. 2004) (language insufficient where lower court opinion rejected claims on the merits). The Sixth Circuit has recently granted rehearing en banc to resolve this issue. See *Guilmette v. Howes*, No. 08-2256, 2010 U.S. App. LEXIS 5684 (6th Cir. Mar. 12, 2010).

While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. See *Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, while a procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); see also, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis

because resolution of the default issue would require remand and further judicial proceedings); *Walters v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995).

In light of the uncertainty in the Sixth Circuit regarding this issue, the Court should therefore proceed to the merits of Petitioner's claims. Indeed, the Sixth Circuit itself has taken this approach. See *Roush v. Burt*, 313 Fed. Appx. 754, 757-58 (6th Cir. 2008) (noting the Sixth Circuit's conflicting decisions and the rule that procedural default is not jurisdictional, and concluding "because we affirm the district court's decision on the merits, we leave issues regarding procedural default and the generic use of MCR 6.508(D) for another day.").

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384(1986) (quoting *Strickland*, 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005). To prevail on his ineffective assistance of counsel claims, a habeas petitioner must show that the state court's conclusion regarding these claims was contrary to, or an unreasonable application of, *Strickland. See e.g. Dittrich v. Woods,* 602 F.Supp.2d 802, 807 (E.D.Mich. 2009).

The police report containing the Denise Renner information appears to date from the initial investigation, and it provides the most compelling allegation of ineffective

assistance. It describes Renner as a prostitute whom the victim had previously abused and kidnapped at gunpoint in February of 1986. The report states that a confidential informant named Renner and two men, Mario Burton and Larry Hudson, as the people who set-up the victim's murder. Petitioner has also provided two portions of transcripts from interviews of Milo Burton occurring on May 26, and July 18, 1987. During the interview, Milo Burton stated that his brother Mario Burton, Hudson, and Renner were responsible for the murder.

Petitioner's claim that his trial counsel did know of and investigate this line of defense is contradicted by the record. At an August 11, 2003 hearing defense counsel requested an adjournment of the trial date because he was still in the process of reviewing the over 800-pages of materials provided by the prosecution. On September 15, 2003, defense counsel argued a motion to dismiss the case on grounds of pre-indictment delay, noting that "there's additional records that are now gone. Memories are now gone." In arguing that it was difficult for Petitioner to substantiate an alibi defense due to the passage of sixteen years between the murder and the filing of charges, counsel referred to specific leads he attempted to pursue.

Also at the September motion hearing defense counsel moved to compel discovery, asserting that the prosecution had omitted cover sheets from the police reports that contained up-to-date addresses and contact information for the witnesses. He complained that the old addresses in the reports amounted to "being sent on wild goose chases that are designed to eat up my time and that makes it more difficult for me." Defense counsel additionally argued that he suspected he was only provided with the complete cold-case investigation but was not provided with the entire contents of the original investigation file.

The prosecutor responded that defense counsel was given everything, but that he was willing to let defense counsel look at everything he had. Therefore, the record indicates that prior to trial defense counsel was conducting an investigation and actively pursuing leads contained in the police reports.

Additionally, it is clear that this investigation included obtaining the information regarding Milo Burton. Defense counsel called investigator Woods as a defense witness. Defense counsel attempted to refresh Woods' memory regarding a search warrant he obtained to have Milo Burton wear a recording device while he met with Tommy Vasquez. More importantly, defense counsel questioned Woods about other suspects that Woods had developed early in the investigation. He questioned Woods about the fact that an informant had identified people not including Petitioner, and who were not part of the Vasquez organization, as being responsible for the murder. This is a clear allusion to Milo Burton's claims. Accordingly, Petitioner's allegation that his counsel did not know about Burton or his allegations cannot be supported in light of the trial record. Rather, the record shows that counsel knew of Burton and used the information in a reasonable manner in presenting Woods' testimony. There is a strong presumption that counsel performed effectively, and counsel's limited use of Burton was reasonable in light of the particular circumstances of the case. *Strickland*, 466 U.S. at 691.

Next, the portion of the police report containing the statement from Elwood Priess is undated, but it appears it was generated at the time of the initial police investigation in 1986. Priess told police that another man told him that he saw a dark-colored station wagon parked on the roadway near the location of the body on the night of the homicide. The report does not identify the person who made the statement to Priess. Petitioner does

18

not explain how this information would have benefitted his defense. There was no dispute at trial that the victim's body was left by the highway on the night in question. The information that the vehicle was a dark-colored station wagon does not contradict any theory advanced by the prosecution or aid the defense: the evidence showed that Petitioner and the Vasquez organization had access to various vehicles. Furthermore, Priess did not make the observation himself, but stated that he heard it from another unidentified man. By the time defense counsel knew of this information this thin lead to a unknown person was over sixteen-years old. Even assuming defense counsel did not follow this lead, Petitioner has not demonstrated how he was prejudiced under the *Strickland* standard.

The report containing the statement from Erwin Smith also appears to be part of the initial 1986 investigation. In relevant part, Smith described seeing a Lincoln parked about one-half mile from the location the body was found between 4:15 and 4:30 on the morning of August 25, 1986. Smith observed two young African American males walking near there disabled vehicle. He also observed a disabled truck some distance to the east of the Lincoln. Smith told the investigator that he doubted he could identify the men, but that he might be able to identify the vehicle. The report contained a Texas address and phone number for Smith.

The observation of two African-American males in the vicinity of the body was potentially exculpatory in light of the fact that Petitioner is not African-American. However, as with the other statements taken in 1986, it was well more than a decade-old by the time defense counsel knew about it, and the person making the statement at that time apparently lived in Texas. In any event, the statement indicates that the vehicle was

disabled and that it was parked about a half-mile down the highway from where the body was discovered. The trial evidence indicated that the police believed that the body was dragged to its resting place from the side of the road, but there was never any suggestion that it was dragged along a busy highway for a half-mile. Accordingly, counsel was not ineffective for failing to locate and present this potential witness. Furthermore, he was not prejudiced because even if this witness had been located and testified in accordance with his statement, there is no reasonable probability that it would have affected the outcome of the trial.

Finally, the report regarding Patti Ware appears to have been produced in 2002 as part of the cold case investigation. Ware told a police investigator that her brother, Tony Haddley, admitted to her that he shot the victim and left him on the side of the road. She told the police that her motivation for making the statement was the possibility of receiving a reward, and that she would not testify against her brother in court.

It is clear from the record that defense counsel had a complete copy of the cold-case file and sought to contact all the witnesses. Defense counsel did not perform deficiently by failing to present Ware. Her statement that she accused her brother of the crime in order to obtain reward money taken together with the fact that there is no other evidence connecting the victim to Tony Haddley leads to the conclusion that it was reasonable for defense counsel to disregard this specious defense in favor of the vigorous one he presented at trial.

Defense counsel's theory of defense was that the key prosecution witnesses, almost all of whom were criminals, were not believable and had motives to place the blame for the murder on Petitioner. Petitioner testified that while he was a part of the

Vasquez organization, he did not even know the victim and was living in Grand Rapids at the time of the murder. Defense counsel called six additional defense witnesses besides Petitioner himself to support his theory.

The record does not support the allegation that defense counsel was unaware of these additional potential witnesses. Indeed, the record reveals that counsel argued aggressively to obtain all investigative reports, including updated contact information, and that this investigation resulted in his becoming aware of Burton. It must be presumed that counsel's decision not to call Burton as a witness was a reasonable one. Defense counsel's failure to call the additional witnesses at trial was not ineffective.

Because Petitioner has failed to show that his trial counsel was ineffective, Petitioner is unable to establish that appellate counsel was ineffective for failing to raise these ineffective assistance of trial counsel claims on his appeal of right. *See Johnson v. Smith,* 219 F. Supp. 2d 871, 883 (E.D. Mich. 2002).

### Claim 4. Petitioner was denied his constitutional right to a retained attorney of his choice.

Petitioner next claims that the trial court violated his Sixth Amendment right to the counsel of choice by removing his retained attorney from the case. Respondent asserts that this claim was reasonable denied by the Michigan Court of Appeals during Petitioner's appeal of right.

On June 11, 2003, the trial court heard argument on the prosecutor's motion to disqualify defense counsel based on a conflict of interest. At the hearing defense counsel informed the court that he had represented: Vincent Bridges, Mark Eaton, Kim Polendo,

Sandra Scheffler (Perkins), who were named on the prosecutor's witness list. Defense counsel stated, however: "My client indicates to me in this case that he is willing to proceed. I think I can be fair. I need to bring it to the court's attention."

Despite Petitioner's apparent waiver, the trial court nevertheless disqualified defense counsel based on his former representation of these prosecution witnesses:

> Given the fact that Mr. Rhodes has been attorney for potential witnesses, I can see a situation in which the attorney client privilege, for example, where the witness is on the stand, Mr. Rhodes could conceivably have come into information from that witness that would be detrimental to the witness, to wit, for example, that the witness has committed perjury, and I don't know that to be the case, but it is those kinds of situations where Mr. Rhodes would be placed in a very uncomfortable, in my view, untenable position of either being thorough and aggressive in his cross-examination or in the alternative to protect some interest that the witness may have, vis-a-vis attorney client privilege with Mr. Rhodes, this is adverse to Mr. Hoffinan's interest. And it is for that reason then that I will require Mr. Rhodes to withdraw. I do so reluctantly, Mr.Hoffman because under the Constitution you're entitled to have a lawyer that you choose. And were it not for this situation, you know I would not disqualify Mr. Rhodes. I didn't do so earlier, but given the fact that there are these additional witnesses that could put him and as a result you in a position of where the defense would not be thorough and aggressive, it is for that reason that I will require Mr. Rhodes to withdraw. Motion Hearing, at 86-87.

One element of the Sixth Amendment right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him or her. *U.S. v. Gonzalez-Lopez,* 548 U.S. 140, 144 (2006)(*citing Wheat v. United States*, 486 U.S. 153, 159 (1988)). Indeed, "[t]he Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Id.* (*citing Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)). Where a criminal defendant's right to be assisted by counsel of one's choice is wrongly denied, it

is unnecessary for a reviewing court to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. *Id.* at 148: "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.*

The right to counsel "is circumscribed in several important respects," however, and does not extend to an attorney laboring under an actual conflict of interest. *Wheat*, 486 U.S. at 159, 162. The district court "must recognize a presumption in favor of petitioner's counsel of choice"; however, "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164.

In this case, the state courts reasonably concluded that Petitioner was not denied his right to counsel of his choice because the counsel he retained had formerly represented several of the prosecution witnesses. Specifically, retained counsel's former clients included witnesses Vincent Bridges, Kim Polendo, and Sandra Scheffler – all of whom testified at trial. Appointed counsel cross-examined these witnesses in ways that their former attorney would have been unable to do. The cross-examination of Polendo centered on the allegation that she was fabricating her testimony against Petitioner. The cross-examination of Bridges included information about his involvement in the Vasquez organization, his prior criminal history, and his reasons for not testifying against John Vasquez. Retained counsel's ability to cross-examine these witnesses on these topics would have been compromised by his ethical obligations to his former clients.

A defendant enjoys a presumption in favor of counsel of choice, but such a presumption may be overcome because such a choice must be balanced with the "the court's interest in the integrity of the proceedings and the public's interest in the proper administration of justice." *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995); *see also Wheat*, 486 U.S. at 164. Even where a defendant wishes to waive his right to conflict-free counsel, trial courts retain the authority to disqualify counsel "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163; *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008)

Such discretion is warranted, moreover, because of the "whipsaw" nature of the waiver of conflict-free representation: "If a trial court disqualifies counsel, defendant will argue . . . a violation of his Sixth Amendment right to counsel of his choice. If a trial court refuses to disqualify an attorney, a defendant may later attempt to raise an ineffective assistance of counsel claim based on conflict of interest, asserting that his waiver was not knowingly or voluntarily made." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1353-1354 (6th Cir. 1993) *(citing Wheat*, 486 U.S. at 161-62). The facts of the instant case allowed the state trial court to disqualifying counsel without violating his right to the counsel of his choice. Although defendant attempted to waive his right to conflict-free counsel, the trial court reasonably explained that retained counsel's ability to cross-examine his former clients may have been compromised by trial developments. The decision did not involve an unreasonable application of federal law.

**Claim 5. This Court should issue the writ because of the state's prosecutorial misconduct in his closing arguments.**

Petitioner's last claim asserts that the prosecutor committed misconduct during his closing argument. He points to five passages in the closing argument transcript where he asserts that the prosecutor vouched for the credibility of witnesses, denigrated defense counsel, and injected  racial prejudices. Respondent contends that the claim is without merit.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935).  When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor.  On habeas review, a court's role is to determine whether the conduct was so egregious as to render the entire trial fundamentally unfair. *Serra v. Michigan Department of Corrections*, 4 F. 3d 1348, 1355-1356 (6th Cir. 1993).  When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million*, 201 F. 3d 711, 717 (6th Cir. 2000).  If the conduct is improper, the district court must then examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ. *Id.*  In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the

competent proof against the accused. *Serra,* 4 F. 3d at 1355-56; *See also Simpson v. Warren,* 662 F. Supp. 2d 835, 853 (E.D. Mich. 2009).        Petitioner first argues that the prosecutor vouched for the credibility of his witnesses in the following two portions of his closing argument:

> Most importantly though, folks, the passage of time in this case did not weaken the resolve of the investigators who worked on the case, of the original investigator, of the cold case homicide team investigators. There was resolve to bring closure to the family, family of Vincent Brown by exposing the truth about his killing. A number of witnesses in this case, Kim Polendo, Vincent Bridges, Charles Rushing, Robert Candelaria, all said words to the effect that providing testimony in this case was quite simply the right thing to do. At least in part what was said here, because it's the right thing to do. That's sort of a sentiment that isn't difficult to understand because you know what, it is the right thing to do. [Trial Tr. September 24, 2003, at 63-64].

> *          *          *

> [D]id he come off as a liar, Vincent Bridges? Well, he got an assault with intent to murder charge reduced to a felonious assault. What did Vincent Bridges say about that? He said they didn't have a good case. So it got pled down. They didn't have a strong case, folks. Think about that. If the prosecution was willing to give Vincent Bridges a felonious assault, assault to dangerous weapon, if the prosecution was willing to give Vincent Bridges a reduction from assault which didn't happen, don't you think that they would have been willing to do that on a child support case? That guy ends up going to prison. The fact that he is serving time in prison, time on a child support case is the best evidence we have that that assault murder case wasn't pled down as a result of his testimony here. Because it doesn't make sense. Is he gonna deal on assault case, certainly gonna get a deal on a child support case. Which is more serious? You think about how he acted on that witness stand. That guy's a criminal? I tell you what on this stand he's telling the truth.

> [DEFENSE COUNSEL]: Objection, Your Honor.

> THE COURT: I'm going to sustain.

> [PROSECUTOR]: Use your common reason to determine what was obvious about whether he was truthful. . . [Trial Tr. September 24, 2003, at 134-135].

A prosecutor may not express a personal opinion concerning the guilt of a defendant or the credibility of trial witnesses, because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir.1999). However, a prosecutor is free to argue that the jury should arrive at a particular conclusion based upon the record evidence. *Id.* The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *United States v. Causey*, 834 F. 2d 1277, 1283 (6th Cir. 1987). "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis,* 170 F. 3d 546, 550 (6th Cir. 1999)(internal citations omitted); *See also Griffin v. Berghuis,* 298 F. Supp. 2d 663, 674-75 (E.D. Mich. 2004).

Here, the prosecutor's statements do not amount to vouching. Nowhere in his comments did the prosecutor suggest that he had special or hidden knowledge that the witnesses were testifying truthfully. Rather, he asserted that the passage of time and amount of work that the investigators put into the case provided reasons to believe their testimony. He asserted that the former Vasquez organization witnesses should be believed because they stated that testifying was "the right thing to do." Whether such an argument presents a persuasive reason to lend more credence to their testimony is one thing, but it certainly does not amount to improper vouching.

Similarly, the prosecutor's comments with respect to Bridges' testimony focused on his demeanor on the stand and the credibility of his testimony that he did not receive a plea deal in exchange for testifying, a point disputed by defense counsel. The prosecutor did not suggest that he had hidden knowledge that Bridges received no deal. Rather, he argued from the evidence concerning his convictions that it was not credible to believe that he received a deal The prosecutor did not engage in improper vouching.

Petitioner next argues that the prosecutor disparaged defense counsel in the following two portions of his closing argument:

> Yesterday Mr. Eagon [defense counsel] asked a question in the kind of style that he's apparently fond of in trial, more of a statement type question. He said to Jerry Woods something along the lines isn't it true that all the prosecution has here are witnesses against defendant of what he says and that doesn't have any – quote – real evidence. Ladies and gentlemen, I'm going to ask you to follow the instruction that judge Kingsley gives you. He will tell you that evidence is the sworn testimony of witnesses and any exhibits that have been entered. [Trial Tr. September 24, 2003, at 68].

> *         *         *

> You know, one of the most ridiculous arguments in this entire case is this homosexual homicide, murdered there at the crime scene or at the apartment because of this blanket. We have a murder here that happened. That murder, clean person, whoever that was – took the wrong thing. Well, took the pillow, put the pillow up to Mr. Brown – who apparently wasn't wearing the hat – put the pillow over Mr. Brown, shot him, took the pillow away. They didn't want to leave [the] pillow there, because it would leave a mess, then decided, you know, take Mr. Brown's body, put him in the car, take him over to I-94 near the 115, throw him out of the car, I'm gonna take a hat. . .So what I'm going to do is – that killer – I'm gonna. . . take a hat. . .you know, [Brown] likes to wear his hat backwards, shoot a shot through that hat, put that hole there. I'm gonna confuse those investigators.

> The mental gymnastics that you need to go through to buy the garbage [defense counsel] is telling you, it can't be done. Where's the hole on [the] other side of the hat?. . .What he is arguing is garbage, that there is no evidence to back up and support. You do what you do with garbage. You throw it away. Period. [Trial Tr. September 24, 2003, at 127-128].

28

Although an attorney must not be permitted to make unfounded and inflammatory attacks on an opposing advocate, a prosecutor's statements in closing argument regarding defense counsel must be viewed in context. *United States v. Catlett*, 97 F. 3d 565, 572 (D.C. Cir. 1996); *Makidon v. Elo*, 2000 WL 791795, * 8 (E.D. Mich. May 26, 2000). Although prosecutorial attacks on the credibility or motives of defense counsel are not permitted, the prosecutor has the right to comment on a defense counsel's argument during summation. *Mickens v. United States*, 53 F. Supp. 2d 326, 332 (E.D.N.Y. 1999). In the present case, the prosecutor's comments were not improper, because when viewed in context, they attacked defense counsel's arguments, not defense counsel personally. *See United States v. Xiong,* 262 F. 3d 672, 675 (7th Cir. 2001); *United States v. McCarter,* 307 F. Supp. 2d 991, 996 (N.D. Ill. 2004). In the first passage the prosecutor commented upon defense counsel's characterization of the prosecution evidence as not being "real." He then asked the jury to listen the trial court's definition of evidence and not defense counsel's definition. The second passage is a direct attack on defense counsel's theory that the murder resulted from a same-sex liaison gone wrong. In characterizing the theory as "garbage," the prosecutor discussed the improbability of the scenario and the lack of evidentiary support. The prosecutor did not denigrate defense counsel.

Finally, Petitioner claims that the prosecutor improperly suggested a racial motive for the crime with the following statement during closing argument:

> [Petitioner] committed the murder, Espinoza was told by [Petitioner] that the name of the person was Spankie and the name of the person was nigger, and that the person was someone with a last name Brown. Those are all details that Raymond Espinoza could not have known from anyone other than [Petitioner]. . .It's precisely because that racist idea – that racist attitude that he would have disclosed that sort of information to his racist buddy, Mr. Espinoza. [Trial Tr. September 24, 2003, at 76].

This argument was supported by Espinoza's testimony regarding Petitioner's motive for the murder and attempted to explain why Petitioner chose to share the story with Espinoza after he was confronted by an African-American inmate in prison. Espinoza testified that while working in prison with Petitioner an African-American man bumped into their cart, making Petitioner  angry. Petitioner asked Espinoza if he liked African-Americans, and  Espinoza said that he did not. This provided the segue for Petitioner to recount Brown's murder. The prosecutor was not required to ignore the circumstances surrounding Petitioner's statement to Espinoza. He was permitted to argue that those circumstances - which allegedly included the two men sharing racist views - supported Espinoza's credibility. See *United States v. Collins*, 779 F.2d 1520, 1532 (11th Cir. 1986); *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985). The comment was not improper.

## IV. Conclusion

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must:

> issue or deny a certificate of appealability when it enters a final order adverse to the applicant.... If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).
> Rule 11, Rules Governing Section 2254 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Courts must either

issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R.App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

The Court finds that reasonable jurists could debate whether this Court correctly denied Petitioner's counsel of choice (habeas claim III) and ineffective assistance of counsel (habeas claim IV) claims. Therefore, the Court will grant a certificate of appealability with respect to those claims. The Court finds that no reasonable jurist would debate about the resolution of Petitioner's first, second, or fifth claims. A certificate of appealability will be denied with respect to those claims.

The standard for granting an application for leave to proceed *in forma pauperis* (IFP) is a lower standard than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002)(citing *United States v. Youngblood*, 116 F. 3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Because jurists of reason could debate this

Court's resolution of Petitioner's third and fourth claims, the issues are not frivolous. Therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal. *Id.*

## V.   ORDER

IT IS ORDERED that the Petition for Writ of Habeas Corpus is **DENIED.**

IT IS FURTHER ORDERED That a Certificate of Appealability is **GRANTED** with respect to Petitioner's denial of counsel of choice and ineffective assistance of counsel claims but **DENIED** with respect to his remaining claims.

IT IS FURTHER ORDERED that Petitioner will be **GRANTED** leave to appeal *in forma pauperis.*

S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: October 20, 2010

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on October 20, 2010, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary